CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED

December 12, 2025
LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **ROBERT BLANKENSHIP,** | ) | |
| Plaintiff | ) | Civil Action No. 1:24cv00045 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **FRANK BISIGNANO,** | ) | |
| **Commissioner of Social Security,** | ) | By:  PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

### I. Background and Standard of Review

Plaintiff, Robert Blankenship, ("Blankenship"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423. Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Blankenship has requested oral argument, but the court concludes that Blankenship's brief is sufficiently informative and that oral argument would not aid in the decisional process. Therefore, his request for oral argument is denied. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which

a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Blankenship protectively filed an application for DIB on September 2, 2021, alleging disability as of July 25, 2016, due to back pain, leg pain and numbness, hypertension, a heart condition and hearing loss. (Record, ("R."), at 238-42, 293.) The claim was denied initially and on reconsideration. (R. at 102-11.) Blankenship requested a hearing before an administrative law judge, ("ALJ"). (R. at 112-13.) A hearing was held on June 26, 2023, at which Blankenship was represented by counsel. (R. at 42-72.)

By decision dated September 12, 2023, the ALJ denied Blankenship's claim. (R. at 17-34.) The ALJ found Blankenship met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2021. (R. at 19.) The ALJ found Blankenship had not engaged in substantial gainful activity from July 25, 2016, the alleged onset date, through the date last insured.[1] (R. at 19.) The ALJ determined Blankenship had severe impairments, namely, lumbar degenerative disc disease and spondylosis, status-post decompression and fusion and adjustment disorder with depressed mood, but he found Blankenship did not have an impairment

---

[1] Therefore, Blankenship must show that he became disabled between July 25, 2016, his alleged disability onset date, and December 31, 2021, the date last insured, to be eligible for DIB benefits.

or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-20.)

The ALJ found that, through the date last insured, Blankenship had the residual functional capacity to perform light[2] work, except he must have been permitted to alternate between sitting and standing every 30 minutes; he could occasionally stoop, kneel, crouch and climb ramps and stairs; he could never crawl or climb ladders, ropes or scaffolds; he must avoid unprotected heights, dangerous moving machinery, extreme temperatures, extreme humidity, wetness and vibration; he could not operate foot controls; he could understand, remember and carry out simple instructions; he could not perform assembly line work or work that required hourly quotas; he could use judgement to make simple, work-related decisions and he could deal with occasional changes in the work setting. (R. at 23.) The ALJ found Blankenship was unable to perform any past relevant work through the date last insured. (R. at 31-32.) However, based on his age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found he could have performed jobs existing in significant numbers in the national economy, including those of a hand bander, a tag inserter and a sorter II. (R. at 32-33.) Thus, the ALJ concluded Blankenship was not under a disability as defined by the Act, from July 25, 2016, through December 31, 2021, and he was not eligible for DIB benefits. (R. at 33-34.) *See* 20 C.F.R. § 404.1520(g) (2024).

After the ALJ issued his decision, Blankenship pursued his administrative appeals, (R. at 208-09), but the Appeals Council denied his request for review. (R.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2024).

at 1-5.) Blankenship then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2024). This case is before this court on Blankenship's brief filed June 2, 2025, and the Commissioner's brief filed June 26, 2025.

## II. Facts

Blankenship was born in 1975, (R. at 32), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and past relevant work as a shuttle car operator, a carpenter, a trailer assembler III, a scoop operator, a roof bolter, a rock dust sprayer, a company laborer, a mine electrician, a mine equipment mechanic, a construction worker and a drywall hanger. (R. at 31-3, 81.) At his June 26, 2023, hearing, Blankenship testified that he suffered from a work-related injury on July 25, 2016, that caused a herniated disc in his lower back. (R. at 48.) Blankenship said he worked at a coal mine, and the last day he worked was the day of his injury. (R. at 50.) Blankenship said that, at the coal mine, he lifted up to 100 pounds. (R. at 50.) Blankenship said he had spinal surgery to fix the herniated disc, but, after the surgery, he still had numbness in his legs, worse on the left, and lower back pain. (R. at 52.) Blankenship said he had 10 out of 10 pain before his second surgery on July 8, 2021. (R. at 53.) Blankenship said that the pain was so bad, he sought care in the emergency department. (R. at 53.) Blankenship testified that, after the second spinal fusion surgery, his pain improved to six to eight out of 10. (R. at 53.) Blankenship said pain medication reduced his pain to a four or five on a good day. (R. at 54.) Blankenship testified that he had three to four "good days" a month, and, on the remaining days, his pain was around an eight out of 10. (R. at 54.) Blankenship testified that he took warm showers for hours at a time and stretched for 45 minutes to an hour multiple times a day to alleviate the pain. (R. at

54-55.) Blankenship testified that the pain was in his lower back and radiated down his left leg all the way to his feet. (R. at 55.) Blankenship testified that he could sit for 20 minutes at a time. (R. at 55.) Blankenship testified that he could lift, but not hold, 15 pounds maximum and that he wore a back and neck brace. (R. at 56.) Blankenship testified that he slept about three hours per night, but his sleep was disrupted by pain. (R. at 56.) Blankenship testified that, as a result of his accident, he suffered from depression, which caused low energy and a lack of motivation. (R. at 57.) Blankenship testified his pain caused him to be unable to focus. (R. at 58.) Blankenship testified that his doctors suggested a third spinal fusion surgery, but he did not plan on undergoing the procedure because his other two surgeries had not helped him. (R. at 58.) Blankenship testified that his doctors had restricted him from heavy lifting. (R. at 58.) Blankenship testified that, in a typical day, he woke up at 5:00 A.M., spent an hour in the shower, an hour doing stretches, took his children to school, stretched again, washed dishes and then sat in a recliner for the remainder of the day. (R. at 59.) Additionally, Blankenship testified that he went to church weekly. (R. at 59.) Blankenship testified that his wife assisted him with putting his socks and pants on. (R. at 59.) Blankenship testified that his son had to quit wrestling and playing basketball because he could no longer assist him. (R. at 60.) Blankenship testified that his pain had increased since his second spinal fusion surgery in July 2021. (R. at 61.)

In rendering his decision, the ALJ reviewed records from Eric Oritt, Ph.D., a state agency psychologist; Jo McClain, Psy.D., a state agency psychologist; Dr. Jack Hutcheson, Jr., M.D., a state agency physician; Dr. Michael Koch, M.D., a state agency physician; Dr. Bart Olash, M.D.; Dr. Michael A. Chunn, M.D.; Dr. Dinkar Patel, M.D.; Dr. Kimberly Terry, M.D.; Dr. Daniel Gutierrez, D.O.; Dr. Russell L. Travis, M.D.; Dr. David E. Muffly, M.D.; Dr. Timothy C. Kriss, M.D.; Dr. Anthony

J. McEldowney, M.D.; C. Christopher Allen, Ph.D.; Dr. Timothy Allen, M.D.; Pikeville Medical Center; Dr. Robert Shurtleff, D.O.; Buchanan General Hospital; Dr. Antoinette Justice, D.O.; Dr. Peter Zajac, D.O.; Dr. Duane Densler, M.D.; Commonwealth Family Care; Associated Hearing & Diagnostics; Merritt Physical Therapy & Rehabilitation, Inc.; Dr. Rick Pellant, D.O.; Brandie Dotson, N.P.; and Dr. Latisha Hilton, D.O.

Blankenship presented to the Pikeville Medical Center Emergency Department on July 26, 2016, complaining of back pain after his work-related injury. (R. at 544.) Blankenship described the pain as constant, sharp and radiating down the right lower extremity with tingling on the bottom of his foot. (R. at 544.) That same day, a CT of the lumbar spine without contrast showed no evidence of acute lumbar spine fracture or acute malalignment and minimal lower lumbar spine disc bulging. (R. at 530.)

On July 28, 2016, Blankenship saw Dr. Robert Shurtleff, D.O., complaining of lower back pain. (R. at 571.) Blankenship reported that he had received Toradol and steroid shots at the hospital, which provided some relief, but Flexeril, which he was sent home with, he said did not provide any relief. (R. at 571.)

Blankenship attended physical therapy with Judy McClanahan, D.P.T., throughout August 2016. On August 4, Blankenship complained of pain that was currently eight out of 10, but 10 out of 10 at its worst. (R. at 411.) Blankenship had an antalgic gait and difficulty with testing, secondary to pain. (R. at 411.) Blankenship had reduced strength, bilaterally, in his iliopsoas, quadriceps and hamstrings; and reduced strength in his right tibialis anterior. (R. at 412.) On August 26, Blankenship reported no improvement in pain after nine physical therapy

sessions, and McClanahan noted that he was unable to progress in physical therapy due to his complaints of pain. (R. at 407.)

Blankenship presented to Buchanan General Hospital Emergency Department on August 16, 2016, complaining of moderate, dull and achy back pain in his lower lumbar spine that radiated to the lower extremities. (R. at 416, 419.) Blankenship reported that he was undergoing physical therapy, but his pain had worsened. (R. at 419.) Blankenship was diagnosed with chronic sciatica with low back pain. (R. at 419.) He received a pain medication injection.

On August 23, 2016, Blankenship saw Dr. Dinkar Patel, M.D., with complaints of back pain and numbness and pain in his right leg. (R. at 391.) Blankenship reported that he was at work pulling on a belt structure, and his back popped. (R. at 391.) Blankenship reported that his pain began immediately, but worsened the next day, and he went to the emergency department, where a CT of the lumbosacral spine showed a bulging disc. (R. at 391.) Blankenship reported that he received a steroid pack, which did not alleviate his symptoms, and he saw another doctor, who advised that he attend physical therapy. (R. at 391.) On physical examination, Blankenship had low back tenderness with muscle spasms and restricted forward flexion of 15 degrees; straight leg raise was positive on the right side at 15 degrees and the left side at 45 degrees; and he walked with a limp. (R. at 391.) Dr. Patel diagnosed backache with lumbosacral sprain and right-sided sciatica. (R. at 392.) Dr. Patel advised Blankenship to stay off work and to continue physical therapy, and he prescribed meloxicam, tizanidine, methylprednisolone dose pack and tramadol with acetaminophen. (R. at 392.)

On August 25, 2016, Blankenship saw Dr. Shurtleff for a workers' compensation follow-up appointment. (R. at 576.) Dr. Shurtleff noted the July 26, 2016, CT scan, which showed no evidence of acute lumbar spine fracture or acute malalignment and minimal lower lumbar spine disc bulging. (R. at 576.) Blankenship reported that he had discontinued physical therapy because it caused him to be in too much pain, and it did not help him. (R. at 576.) Dr. Shurtleff referred Blankenship to neurosurgery and pain management. (R. at 581.) On physical examination, Blankenship had an antalgic gait with full weight bearing; muscle spasm in the left lumbar spine; strength testing was "essentially non-diagnostic secondary to patient pain"; sensation was equal and intact in the lower extremities, bilaterally; Blankenship was unable to lie flat on the table for straight leg raise; and patellar reflexes were equal, but seemed decreased from previous examination, possibly secondary to guarding. (R. at 574.) Dr. Shurtleff ordered an MRI and a cane, per Blankenship's request. (R. at 574.)

Blankenship received an MRI of the lumbar spine without contrast on September 7, 2016. (R. at 521.) He was diagnosed with degenerative disc disease, predominantly centered at the L4-L5 level, and referred to neurosurgery and pain management. (R. at 521, 524.)

Blankenship saw Dr. Shurtleff again on September 15, 2016. (R. at 581-84.) Blankenship stated that physical therapy had not given him any relief. (R. at 584.) Blankenship said his pain level was the same it had been since his injury, but he denied loss of bowel/bladder control or muscle weakness, except when he stood straight up. (R. at 584.) Dr. Shurtleff referred Blankenship to neurosurgery and pain management. (R. at 581.)

Blankenship presented to the emergency department of Buchanan General Hospital on September 21, 2016. (R. at 396.) Blankenship reported that he had pain in his lower lumbar spine and that his doctor would not prescribe pain medications. (R. at 396.) Blankenship was diagnosed with chronic right-sided sciatica with low back pain and received injections of Dilaudid and Phenergan. (R. at 397.) He was prescribed ibuprofen, Flexeril and Ultram. (R. at 400.)

On October 13, 2016, Blankenship saw Dr. Shurtleff, and he had unchanged complaints of back pain. (R. at 587-90.) Blankenship listed his pain level at a four to five on a 10-point scale. (R. at 587.) Blankenship complained that his legs got weak intermittently when he walked. (R. at 587.) Blankenship said that, when he woke up in the mornings, he was unable to move his right leg unless he reached down and pulled on it. (R. at 587.) He also complained of a loss of sensation in his legs. (R. at 587.) Dr. Shurtleff adjusted Blankenship's medication. (R. at 590.)

On November 10, 2016, Blankenship saw Robin Sanger, A.P.R.N., a nurse practitioner, for pain management. (R. at 591-98.) He reported five to six out of 10 pain on average, with 10 out of 10 pain in the mornings. (R. at 596.) He walked with a cane in a stooped position and guarded his back and right leg while ambulating. (R. at 596.) Sanger prescribed Ultram and Neurontin. (R. at 596.)

On November 16, 2016, Blankenship saw Dr. Shurtleff. (R. at 600-03.) Blankenship reported that he had seen pain management but had not yet taken the prescribed medications due to insurance issues. (R. at 600.) Dr. Shurtleff noted that Blankenship needed another referral to neurosurgery, stating that it had not yet gone through due to a denial from workers' compensation. (R. at 602.)

On December 9, 2016, Blankenship had a pain management appointment, where he rated his lower back pain as a five out of 10 and said that it was persistent, fluctuating, stabbing and radiating down to the right knee. (R. at 607.) Blankenship said the pain was worsened by standing and walking and relieved by lying down. (R. at 607.) Blankenship stated that Ultram gave him headaches, but the Neurontin did provide some relief, and he reported that his right leg was getting stronger since his previous appointment. (R. at 611.) Blankenship was prescribed Tylenol-Codeine #3, his Neurontin was increased to twice daily, and he was referred to neurosurgery to determine suitability for injection therapy. (R. at 612.)

Blankenship saw Dr. Shurtleff again on January 4, 2017, where he reported unchanged back pain. (R. at 613-15.) On January 6, 2017, Blankenship saw Sanger again for pain management. (R. at 616-22.) Blankenship reported seven out of 10 low back pain that was fluctuating and persistent and radiated to both lower extremities, with worse pain in the right leg. (R. at 616.) Blankenship reported that his symptoms were aggravated by sitting in any position longer than 15 minutes and alleviated by lying down and rest. (R. at 616.) Sanger discontinued Tylenol-Codeine #3, prescribed Norco and decreased the Neurontin to once daily. (R. at 620.) Blankenship had a pain management appointment on February 3, 2017, where he reported that Neurontin provided some pain relief and helped him rest at night, but taking it twice daily was too sedating. (R. at 802.) Blankenship reported better sleep and that his right leg seemed to be getting stronger. (R. at 801-02.)

Blankenship had an appointment with Dr. Shurtleff on February 15, 2017. (R. at 809.) Blankenship's blood pressure was elevated, he had paraspinal fullness in the right lumbar region, he had an antalgic gait, he used a cane for ambulation, and he complained of moderate pain with motion. (R. at 807-08.)

Blankenship saw Sanger for pain management on March 8, 2017, complaining of continued lower back pain that radiated to the right lower extremity and was a severity of six out of 10. (R. at 810, 817.) Sanger noted that Blankenship walked with a cane in a stooped position and guarded his back and right leg while ambulating. (R. at 815.) Blankenship reported improved sleep, pain that was a three to five out of 10 on average and stated that he could dress himself without assistance. (R. at 815.)

Blankenship had a neurosurgery consultation on March 14, 2017, with Dr. Duane Densler, M.D. (R. at 631-36.) Blankenship's physical examination, including balance and gait, was normal, except for straight leg raises, and Dr. Densler stated that Blankenship was not a candidate for surgery because he had not maximized conservative therapy. (R. a 635.)

Blankenship saw Dr. Shurtleff on March 22, 2017, and stated that his symptoms were stable and unchanged. (R. at 819-22.) Blankenship's blood pressure was elevated but asymptomatic, and physical examination findings remained unchanged. (R. at 820, 822.)

On April 5, 2017, Blankenship saw Sanger for pain management. (R. at 830.) Blankenship reported lower back pain that radiated to the right lower extremity that was a severity of five out of 10. (R. at 824.) Sanger instructed Blankenship to wean off opioid therapy, continue taking Neurontin and ordered a right L4-L5 epidural injection. (R. at 828-29.)

On May 11, 2017, Dr. Russell L. Travis, M.D., a neurosurgeon, conducted an independent medical evaluation of Blankenship for his workers' compensation case.

(R. at 439-69.) Blankenship endorsed constant low back pain that radiated into his right lower extremity and occasionally into his left lower extremity, four to five times a day. (R. at 439.) Blankenship reported that he had attended 14 physical therapy appointments, but they did not provide relief and made his pain worse. (R. at 439.) Blankenship reported that he was then referred to pain management where he was given Tylenol-Codeine #3, steroids and Neurontin. (R. at 439.) Blankenship reported that the Neurontin provided some relief. (R. at 439-40.) Dr. Travis reported that he was unable to fully assess Blankenship's limitations due to "flagrant symptom magnification" and that Blankenship made no attempt to cooperate with the examination. (R. at 444.) Dr. Travis reported that "[s]uch disability is totally out of proportion to a simple dis[c] herniation at L4-5 on the right as exhibited by his MRI." (R. at 444.) Dr. Travis noted that Blankenship might be a surgical candidate, but he would not personally operate on Blankenship due to his symptom magnification. (R. at 444.) Dr. Travis stated that, "in the absence of any evaluator to perform a detailed neurological examination with his cooperative effort, it is difficult to assess what his capabilities are." (R. at 445.)

On May 24, 2017, Blankenship saw Dr. Shurtleff for follow up of his lower back pain. (R. at 637.) Blankenship reported that his pain was unchanged. (R. at 637.) He had elevated blood pressure, but was asymptomatic. (R. at 638, 832.) The same day, Blankenship had an epidural steroid injection. (R. at 769.)

On June 14, 2017, Blankenship underwent an MRI of the lumbar spine without contrast and was diagnosed with mild degenerative-type changes of the lumbar spine without evidence of a focal, high-grade neuroforaminal narrowing or central canal stenosis. (R. at 837.)

On July 26, 2017, Blankenship saw Dr. Shurtleff, stating that his symptoms were stable and unchanged. (R. at 842.) Blankenship reported that his recent lumbar injection made his pain worse for a month before returning to his baseline pain level. (R. at 838.) On physical examination, Blankenship's gait was antalgic and fully weight bearing, he walked with a cane, paraspinal fullness was noted in the lumbar spine on the right, and sensation was decreased in the right lower extremity. (R. at 840.) His blood pressure remained elevated and asymptomatic. (R. at 841.)

Blankenship saw Dr. Densler on September 19, 2017, for a second neurosurgical evaluation. (R. at 649-52.) Blankenship had an unsteady gait, but the remainder of his examination was normal. (R. at 652.) Dr. Densler noted an annular tear at the L4/5 disc and right foraminal stenosis, stating that he discussed surgery with Blankenship, who would decide whether to proceed. (R. at 652.) On September 27, 2017, Blankenship saw Dr. Shurtleff, stating that he wanted to proceed with surgery. (R. at 848.) Dr. Shurtleff noted that Blankenship had attempted essentially all treatment options without relief or improvement. (R. at 850.)

On November 7, 2017, Blankenship saw Dr. Densler, reporting eight out of 10 pain, fatigue, constipation, headache and back pain with joint pain. (R. at 852-56.) Dr. Densler stated that Blankenship had failed conservative measures for a herniated disc, and he would plan a L4-L5 right decompression. (R. at 856.)

On December 6, 2017, Blankenship saw Dr. Shurtleff for lower back pain. (R. at 517-20.) Blankenship reported continued worsening of his low back pain that was not relieved by injections, medication and physical therapy. (R. at 517.) Blankenship reported that he was unable to sleep at night, and the pain affected his daily life. (R. at 517.) On physical examination, Blankenship's gait was antalgic, and he walked

-13-

with a cane; he had muscle spasm of the right lumbar paraspinal muscles that mildly radiated heat; he had an absent deep tendon reflex in his right patella; he had decreased sensation to the right lower extremity, laterally, consistent with L5 dermatome; and strength testing was nondiagnostic, secondary to reproduced low back pain. (R. at 519.) Dr. Shurtleff assessed that Blankenship's condition continued to decline subjectively and objectively, noting his now absent deep tendon reflex in the right lower extremity. (R. at 519.) Dr. Shurtleff ordered nerve conduction studies on the lower extremities and prescribed Neurontin. (R. at 519-20.)

On May 16, 2018, Dr. David E. Muffly, M.D., completed an orthopedic evaluation of Blankenship. (R. at 486-90.) Dr. Muffly reported that Blankenship ambulated with a cane, but could walk slowly without a cane or limp. (R. at 487.) Dr. Muffly found that reflexes were 2+ in the ankles and symmetric; 2+ in the knees and symmetric; Blankenship had decreased sensation in the right left involving the thigh, lower leg and right foot; normal sensation in the left leg; negative 5 out of 5 strength in the right ankle dorsiflexion, but otherwise normal strength; no calf or thigh atrophy; and his straight leg raise test was 50 degrees on the right and 70 degrees on the left. (R. at 487.) Blankenship had full movement of the ankles, knees and hips. (R. at 487.) The lumbar spine was tender with lumbar spasms present; Blankenship could not stand erect, his posture was 10 degrees in a forward flexed position, and he was unable to perform any lumbar extension; lumbar flexion was 60 degrees, and he could reach to within 15 inches of the floor; he complained of pain with movement; right lateral bend was 10, and left lateral bend was 20. (R. at 487.) Dr. Muffly stated that lumbar discectomy surgery would be reasonable treatment because Blankenship had failed to obtain relief with conservative measures. (R. at 489.)

-14-

On January 24, 2019, Blankenship saw Freda Powers, F.N.P, a nurse practitioner, with complaints of hypertension and headaches. (R. at 874.) On physical examination, Blankenship had a headache, elevated blood pressure, tachycardia, shortness of breath and diffuse tenderness in the lumbar spine, but he was ambulating without difficulty. (R. at 875.)

On March 22, 2019, Blankenship saw Powers for complaints of a rash. (R. at 877.) He was anxious and restless, stood up frequently and had a rash, but physical examination was otherwise normal. (R. at 877-78.) On May 18, 2019, Blankenship saw Powers for continued complaints of a rash. (R. at 880.) On physical examination, Blankenship was anxious, restless and stood up frequently, but had no tenderness to palpation and normal range of motion. (R. at 880-81.)

On April 11, 2019, Blankenship's hearing was tested at Associated Hearing & Diagnostics, which showed mild sensorineural hearing loss in the left ear and a moderate mixed hearing loss in the right ear. (R. at 502.) The audiologist referred Blankenship to an ENT for an otological examination, and he recommended a hearing aid evaluation for the right ear if there was no outer or middle ear pathology. (R. at 502.)

On May 22, 2019, Blankenship saw Dr. Shurtleff, requesting an MRI due to continued lower back pain that was not relieved by conservative treatment measures. (R. at 505.) On physical examination, Blankenship had lumbar spasm and moderately reduced range of motion; strength testing was unable to be performed in the right lower extremity secondary to lower back pain; strength was 5/5 in the left lower extremity; and sensation was decreased over entire right lower extremity when compared to the left. (R. at 509.) Dr. Shurtleff advised Blankenship to avoid

maneuvers that would provoke his back pain and ordered an MRI. (R. at 510.) An MRI conducted on June 10, 2019, showed no acute fracture or subluxation of the lumbar spine and multi-level spondylotic changes, most prominent at the L4-L5 level, with neuroforaminal narrowing. (R. at 864.)

On July 7, 2019, Blankenship saw Powers for complaints of an upper respiratory infection. (R. at 883.) On physical examination, Blankenship was anxious and restless, his back was normal and nontender with painless range of motion, and he ambulated without difficulty. (R. at 884.)

On July 19, 2019, Blankenship saw Dr. Densler for a neurosurgical consultation. (R. at 1264.) Dr. Densler noted that he recommended surgery previously, but insurance denied the procedure. (R. at 1264.) Blankenship complained that his pain was more severe than it was previously. (R. at 1264.) On examination, he had significant pain with flexion, extension and rotation of the lumbar spine; straight leg raise testing was positive on the right at 10 degrees; and he had difficult standing straight due to pain. (R. at 1266.) Dr. Densler again recommended a lumbar discectomy decompression and fusion at L4-L5. (R. at 1266.)

On September 25, 2019, Blankenship saw Powers, complaining of low back pain and requesting pain medication, among other things. (R. at 887-89.) Powers advised him to follow up with neurosurgery. (R. at 889.)

On March 5, 2020, Blankenship underwent a lumbar disc decompression at the L4-L5 level and L4-L5 fusion, which was successful and completed with no apparent complications. (R. at 1240-41.) On March 24, 2020, Blankenship reported

that he was doing well following his surgery, with only some residual numbness in his left foot, but he was able to ambulate independently without leg pain. (R. at 1230.)

On May 11, 2020, Blankenship had an initial physical therapy visit following his lumbar spine fusion and decompression. (R. at 903.) Blankenship reported that his right-sided pain had improved, but he had begun experiencing pain his left lower extremity. (R. at 903.) Blankenship demonstrated active range of motion in bilateral lower extremities that was grossly within normal limits, but he had pain with knee extension and hip flexion, which was worse on the left. (R. at 904.) Blankenship complained of pain with all trunk movements, and he had limited range of motion. (R. at 904.) On July 1, 2020, Blankenship endorsed a 50 percent improvement in symptoms since beginning physical therapy, and he rated his pain as a five out of 10. (R. at 968.) He reported continued numbness of the left foot, as well as difficulty climbing stairs and walking long distances. (R. at 968.) On July 28, 2020, Blankenship endorsed four out of 10 pain during treatment, but he could not complete all exercises and was "in noticeable pain throughout [the] treatment session." (R. at 946.) On July 29, 2020, Blankenship rated his pretreatment pain as a four out of 10. (R. at 944.) Blankenship continued physical therapy through August 13, 2020, demonstrating improved lumbar active range of motion and bilateral lower extremity flexibility and strength. (R. at 943.) There was a reduction in Blankenship's perceived level of limitations. (R. at 943.) On November 5, 2020, Blankenship resumed physical therapy due to left and right lower extremity numbness and tingling. (R. at 923.) Blankenship demonstrated deficits in lumbar range of motion, lower extremity strength and functional activity tolerance. (R. at 923.) He identified improved gait, functional mobility and return to work activities as goals. (R. at 923.) In December, Blankenship showed improved lumbar active

range of motion, flexibility and bilateral lower extremity strength, but deficits remained, and his physical therapist recommended extending his physical therapy prescription. (R. at 926.) On January 22, 2021, Blankenship endorsed a 50 percent improvement in his symptoms since beginning physical therapy, stating he had improved lumbar and bilateral lower extremity flexibility, but his pain was a six out of 10, he had weakness in his bilateral lower extremities, and he continued to experience radicular symptoms that were worse on the left. (R. at 930.) On March 4, 2021, Blankenship's physical therapy notes indicated that he had completed 23 sessions. (R. at 938.) Blankenship was recommended for continued physical therapy and was considered to have a good rehabilitation potential. (R. at 1062.) On April 14, 2021, Blankenship reported a 70 percent improvement in his symptoms since starting physical therapy. (R. at 1066.)

On May 13, 2020, Blankenship saw Dr. Densler for a post-operative appointment, stating that his back pain had improved, although he still had some bilateral lower extremity pain and paresthesias. (R. at 1226.) On June 2, 2020, Blankenship had a post-operative appointment with Dr. Densler, stating that his back pain had improved significantly. (R. at 1224.) On August 4, 2020, Blankenship had a follow up with Dr. Densler. (R. at 1221.) Dr. Densler noted that Blankenship had completed physical therapy, was taking minimal pain medication and was doing well with improved symptoms. (R. at 1221-22.) On October 27, 2020, Blankenship saw Dr. Densler, complaining of increasing right lower extremity pain and paresthesia that had started one month previously. (R. at 1218.) Dr. Densler noted that, overall, Blankenship's condition had improved, and physical examination was normal. (R. at 1218-19.)

On November 11, 2020, Blankenship saw Powers, complaining of lower back pain, among other issues. (R. at 890-92.) On physical examination, Blankenship had diffuse tenderness of the lumbar spine with no deformity, spasm or neurovascular deficits. (R. at 891.)

On May 25, 2021, Blankenship saw Dr. Densler, complaining of continued lower back pain despite his earlier surgery. (R. at 1202.) On physical examination, Blankenship had intact strength in the bilateral upper and lower extremities; reflexes were 2/4 for biceps, triceps, brachioradialis, patellar and Achillies tendon, bilaterally and symmetrically; sensation was intact to light touch; and his gait was normal without ataxia. (R. at 1203.) Because there was no evidence of fusion across the L4-L5 spinal vertebras, Dr. Densler recommended a second spinal surgery to revise the previous fusion, in addition to an L5-S1 fusion. (R. at 1203.)

On July 8, 2021, Blankenship had a second lumbar spinal surgery due to continued pain and neuropathy after his first surgery. (R. at 1190.) A pre-operative MRI showed nonunion of the previous fusion at L4-L5. (R. at 1199.) Blankenship tolerated the procedure well, and there were no immediate or apparent complications. (R. at 1193.) On August 17, 2021, Blankenship saw Dr. Densler for a post-operative visit. (R. at 1182.) Dr. Densler reported that Blankenship's condition was "slightly improved," and instructed Blankenship to reduce his pain medication and obtain follow-up imaging in October. (R. at 1184.) On October 8, 2021, Blankenship saw Dr. Densler for another post-operative follow up. (R. at 1361.) Blankenship reported that his symptoms had improved only slightly. (R. at 1361.) Physical examination was normal. (R. at 1362.) Imaging showed "slight evidence of bony fusion." (R. at 1362-63.)

-19-

On November 3, 2021, Blankenship saw Powers for a follow up on hypertension. (R. at 1314.) Blankenship's blood pressure was elevated,[3] but asymptomatic; he had a normal gait and station; he walked without assistance; and he had pain with numbness that radiated to his left lower extremity. (R. at 1315.)

Blankenship saw Dr. Rick Pellant, D.O., for pain management on February 2, 2022. (R. at 1375.) Blankenship reported lower back pain that currently was a five out of 10 and was relieved by opioids and Neurontin. (R. at 1376.) Physical examination was normal except for tenderness of the lumbar spine and lumbar paraspinal regions, bilaterally, on palpation and pain with motion. (R. at 1378-79.) Dr. Pellant diagnosed lumbar spondylosis and radiculopathy; lumbar post-laminectomy syndrome; and degeneration of a lumbar intervertebral disc. (R. at 1380.) He counseled Blankenship on activity modification and a home exercise program, counseled against bed rest and recommended a medial branch block. (R. at 1379-80.) A drug screen collected that day was positive for prescribed Neurontin and prescribed Oxycodone. (R. at 1199, 1391, 1408.)

Blankenship saw Brandie Doston, N.P., a nurse practitioner, for pain management on March 8, 2022. (R. at 1405.) On physical examination, his lumbar spine and bilateral paraspinal regions were tender to palpation, and he had pain with motion. (R. at 1407-08.) Blankenship reported that the medial branch block he received on March 1, 2022, reduced his pain by 80 percent for three days, and he continued to experience pain relief, reporting that he was able to play basketball for the first time in six years. (R. at 1408.) On March 29, 2022, Dr. Pellant performed a

---

[3] Blankenship reported he had been out of medication for a few days. (R. at 1314.)

radiofrequency ablation of the lumbar medial branch nerves at the L4-S1 levels, bilaterally, without any apparent complications. (R. at 1399-1400.)

On March 11, 2022, Eric Oritt, Ph.D., a state agency psychologist, completed a Psychiatric Review Techniques form, ("PRTF"), finding no evidence of severe mental health impairments during the relevant time period. (R. at 77-78.) Likewise, on June 9, 2022, Jo McClain, Psy.D., a state agency psychologist, completed a PRTF at the reconsideration level, finding the same. (R. at 89.)

On March 17, 2022, Dr. Jack Hutcheson Jr., M.D., a state agency physician, completed a physical residual functional capacity assessment, in which he opined that Blankenship could perform sedentary work, except he could sit for a total of only two hours in an eight-hour workday; he could occasionally climb ramps, stairs, ladders, ropes and scaffolds; he could occasionally stoop, kneel, crouch and crawl; and he should avoid concentrated exposure to extreme cold, wetness, vibration and environmental hazards. (R. at 79-80.) Dr. Hutcheson opined that there was no evidence of a severe mental health impairment during the relevant period. (R. at 77.) On June 13, 2022, Dr. Michael Koch, M.D., a state agency physician, completed a physical residual functional capacity assessment at the reconsideration level, in which he opined that Blankenship could perform light work, except that he could frequently climb ramps, stairs, ladders, ropes and scaffolds and stoop; he should avoid concentrated exposure to noise and vibration; and he should avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation. (R. at 91-92.)

On April 27, 2022, Blankenship saw Dotson for pain management. (R. at 1431-35.) Blankenship complained of pain that was a six out of 10. (R. at 1431.) Blankenship stated that the radiofrequency ablation decreased his leg pain by 60

percent and improved his range of motion, but it did not help his lower back pain. (R. at 1434.) Blankenship stated that he had numbness from the left inner knee to the toes, but he denied pain in his left leg. (R. at 1434.) Blankenship was wearing a back brace because he twisted to pick up a water bottle, and his pain had increased over the previous three days. (R. at 1434.) Blankenship reported a deep ache in his legs when he laid down and diarrhea when his lower back pain increased. (R. at 1434.) Dotson prescribed Lyrica and ordered an MRI of the lumbar spine. (R. at 1435.)

On June 22, 2022, Blankenship underwent an independent medical evaluation by Dr. Timothy Kriss, M.D., a neurosurgeon. (R. at 1442.) Dr. Kriss was unable to review the surgery notes for Blankenship's second spinal surgery. (R. at 1443.) Blankenship reported that he did not have any symptoms in his right lower extremity and had not since he underwent the first surgery. (R. at 1444.) Blankenship rated his lower back pain as a seven out of 10 with any activity and his lower left extremity pain as a one out of 10. (R. at 1444.) Blankenship presented with a decreased lumbar range of motion but, "when distracted or observed unknowingly, such as when sitting down or rising from his chair, Mr. Blankenship easily demonstrated" more than 90-degree lumbar flexion, a marked difference from his range of motion on physical examination. (R. at 1445.) Strength testing was 5/5; he had hypersensitivity in the left dorsum and first three toes; and his gait was markedly antalgic. (R. at 1445.) Dr. Kriss reported that "psychological factors continue to drive the clinical presentation, completely independent of the patient's true physical status." (R. at 1447.) Dr. Kriss stated:

> [R]ange of motion methodology would be the methodology of choice
> for a patient with [two] lumbar surgeries within the same spinal region,

however, this methodology would not be remotely practical or accurate in the case of Mr. Blankenship because Mr. Blankenship so obviously and dramatically self-limits mobility testing on direct examination, easily proven today with simple distraction, and proven quite emphatically with sequential differing examination maneuvers by Dr. Travis.

(R. at 1448.) Dr. Kriss concluded by stating:

A small lumbar disc herniation, such as that of Mr. Blankenship at L4/L5, even one that causes temporary lumbar radiculopathy, is not disabling. Indeed it resolves with little or no persistent symptoms in 80% of cases, with or without treatment, with or without surgery. Even when symptoms persist after all treatment, lumbar disc herniation is not disabling, though it can obviously be impairing to some degree. … While acknowledging legitimate physical injury, the psychological factors are dominant.

(R. at 1449.) Dr. Kriss further opined that Blankenship was "very employable" and could "perform any activities that are modestly physically demanding, activities that require standing/ambulation, and any sedentary duties, but he should not lift more than 30 pounds, and should avoid unusually repetitive bending or twisting of the low back." (R. at 1450.)

On August 24, 2022, Blankenship underwent a neuropsychological evaluation with C. Christopher Allen, Ph.D., P.S.C., a licensed clinical psychologist (R. at 1455.) Allen stated that Blankenship possessed personality traits which predisposed him to "greater and more enduring negative emotion and behavioral difficulties than the typical person in response to stress." (R. at 1458.) As a result, "it is almost certain the patient's emotional and functional problems are permanent … treatment may be helpful, [but] intervention is unlikely to completely ameliorate his symptoms." (R.

at 1458.) Allen recommended that Blankenship seek psychological pain management and assessed him with a 12 percent psychiatric impairment. (R. at 1459.)

On September 7, 2022, Blankenship saw Dr. Latisha Hilton, D.O., with complaints of hypertension and back pain. (R. at 1486.) Blankenship reported that he was resting well at night, and his new medication regimen was helping his symptoms. (R. at 1486.) Physical examination was normal, except Blankenship could not sit for long due to back pain, and Dr. Hilton continued his medication regimen with no changes. (R. at 1488-89.) On October 28, 2022, Blankenship saw Dr. Hilton, stating that he had stopped taking the medications that alleviated his back pain shortly before his workers' compensation hearing, and he was unable to get out of bed or ambulate much. (R. at 1519.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2024). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2024).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Blankenship argues that the ALJ's decision is not based on substantial evidence. (Plaintiff's Main Merits Brief, ("Plaintiff's Brief"), at 1.) Specifically, he argues the ALJ erred in his analysis by failing to consider a closed period of disability under Listing § 1.15 during the period following the initial fusion surgery on March 5, 2020, and subsequent revision surgery on July 8, 2021. (Plaintiff's Brief at 12.) Blankenship further argues that the ALJ erred by finding the medical opinion of Dr. Kriss persuasive, which assessed Blankenship's condition after his

date last insured. (Plaintiff's Brief at 17.) Last, Blankenship argues that the ALJ erred by not adequately considering the medical evidence, namely, treatment records from Pikeville Medical Center and Merritt Physical Therapy. (Plaintiff's Brief at 20-21.)

I find that substantial evidence supports the ALJ's finding that Blankenship's impairments did not meet or equal Listing § 1.15[4] for musculoskeletal disorders,

---

[4] Listing § 1.15, *Disorders of the skeletal spine resulting in compromise of a nerve root(s),* requires documentation of A, B, C, *and* D:

    A. Neuro-anatomic (radicular) distribution of one or more of the following *symptoms* consistent with compromise of the affected nerve root(s):
        1. Pain; or
        2. Paresthesia; or
        3. Muscle fatigue.
    AND
    B. Radicular distribution of neurological *signs* present during physical examination…or on a diagnostic test…and evidenced by 1, 2, and either 3 or 4:
        1. Muscle weakness; and
        2. Sign(s) of nerve root irritation, tension, or compression, consistent with compromise of the affected nerve root…; and
        3. Sensory changes evidenced by:
            a. Decreased sensation; or
            b. Sensory nerve deficit (abnormal sensory nerve latency) on electrodiagnostic testing; *or*
        4. Decreased deep tendon reflexes.
    AND
    C. Findings on imaging … consistent with compromise of a nerve root(s) in the cervical or lumbosacral spine.
    AND
    D. Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least *one* of the following:
        1. A documented medical need…for a walker, bilateral canes, or bilateral crutches …or a wheeled and seated mobility device involving the use of both hands; or
        2. An inability to use *one* upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements..., *and* a documented medical need… for a one-handed, hand-held assistive device… that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand…; or

including during the time period between March 5, 2020, and July 8, 2021, because "the evidence does not show the abnormalities on diagnostic testing and/or longitudinal deficits on physical examination to the level required by the listing." (R. at 20.) In his decision, the ALJ cited a November 3, 2021, appointment with Freda Powers, F.N.P, a primary care provider, in which Blankenship had only mild, intermittent low back pain, a normal gait and required no assistive devices. (R. at 21.)

Blankenship argues that he required an assistive device during the March 5, 2020, and July 8, 2021, period. (Plaintiff's Brief at 15-17.) Blankenship points to a March 5, 2020, pre-operative treatment note where Dr. Densler noted that Blankenship used a cane. (R. at 1242.) Blankenship also points to a post-operative evaluation from March 6, 2020, where he used a walker for mobility. (R. at 1247.) While the record does indicate that Blankenship used a cane before his first surgery, the record is clear that he no longer required the use of one after surgery. Blankenship contends that the requirements of Listing § 1.15 were satisfied because there is no evidence that use of the walker was rescinded prior to Blankenship's second surgery. (Plaintiff's Brief at 17.) However, Blankenship's physical therapy records from March 5, 2020, through July 8, 2021, do not document that he utilized a mobility device. For example, in his initial physical therapy evaluation on May 11, 2020, the only durable medical equipment that he endorsed utilizing was a back brace, and Blankenship stated that he was able to independently walk and move around, although it was more difficult, painful and slow. (R. at 903.) Blankenship reported a 70 percent improvement in his symptoms from physical therapy in April

---

3. An inability to use *both* upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements….

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.15 (2024).

14, 2021, indicating substantial improvement before the second surgery. (R. at 1066.) Observations from surveillance footage, taken before the period in question, indicate that even before the first surgery, Blankenship did not need to use a cane for ambulation every day, and there is no evidence from the March 2020 to July 2021 period that suggests that he needed to use a cane or a walker even part time. Therefore, I find that the ALJ's decision that Blankenship did not meet the "D" criteria in listing § 1.15 is supported by substantial evidence.

Blankenship next argues that the ALJ applied improper weight[5] to the medical opinion of Dr. Kriss, who completed a consultative examination of Blankenship on June 22, 2022, six months after the date last insured. (Plaintiff's Brief at 17.) Regarding Blankenship's maximum medical improvement, Dr. Kriss stated:

> The work-related musculoskeletal strain symptoms have never subjectively "improved" long-term, because the psychological factors continue to drive the clinical presentation, completely independent of the patient's true physical status. Because of this, clinically, there is no obvious point in time at which to declare "maximum medical improvement," since the patient never showed sustained subjective improvement in back pain.

> Therefore[,] the most scientific means by which to determine maximum medical improvement in this case would be simply to compare Mr. Blankenship to other patients the same age with similar routine lumbar disc herniation causing lumbar radiculopathy treated surgically, including fusion.

---

[5] The court notes that for claims filed on or after March 27, 2017, like Blankenship's, the ALJ does not weigh medical opinions, but assesses their persuasiveness. *See* 20 C.F.R. § 404.1520c(a) (2024).

> In that setting, most patients would reach maximum medical improvement in [three] to [six] months. Roughly 90% of all bone healing and nerve healing occurs within just [three] months. The right L5 lumbar radiculopathy resolved completely rather quickly. The primary retarding factors to recovery after the initial [first] few months are psychological, not physical: motivation, symptom magnification, secondary gain. These obscure any plateau in physical healing.

> Thus, at the absolute latest, I would declare "maximum medical improvement" [six] months after the date of the [second] fusion surgery. Maximum medical improvement therefore transpired on January 8, 2022.

(R. at 1447.) Therefore, while Dr. Kriss's examination was conducted approximately six months after Blankenship's date last insured, the maximum medical improvement date he applied to Blankenship was only one week after December 31, 2021, the date last insured. The Fourth Circuit has repeatedly held that medical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's date last insured. *See Woolridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987); *Cox v. Heckler*, 770 F.2d 411, 413 (4th Cir. 1985). While not all evidence after the date last insured must be considered, "post-DLI medical evidence generally is admissible in an SSA disability determination in such instances in which that evidence permits an inference of linkage with the claimant's pre-DLI condition." *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012) (citing *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969)). In evaluating Dr. Kriss's medical opinion, the ALJ found that Dr. Kriss's evaluation was "consistent with the totality of the evidence, including records from the claimant's primary care provider the month before his date last insured," which showed that Blankenship "had only mild intermittent low back pain, with normal gait, and no use of any assistive devices." (R. at 30.) Additionally, Dr. Kriss's evaluation was based not only on his

contemporaneous review of Blankenship's condition, but on his review of
Blankenship's medical record from the date of the injury onward. (R. at 1448-49.)
Therefore, I find that the ALJ did not err in his consideration of Dr. Kriss's medical
opinion.

Blankenship next argues that the ALJ failed to consider medical records from
Pikeville Medical Center and Merritt Physical Therapy. (Plaintiff's Brief at 21.)
Blankenship argues that the ALJ's "[f]ailure to fully consider these medical records
is not harmless error as these medical records provide the clearest longitudinal view
of Blankenship's physical condition" from the date of his injury through the date last
insured. (Plaintiff's Brief at 21.)

On July 28, 2016, Blankenship saw Dr. Shurtleff at Pikeville Medical Center
three days after his injury. (R. at 721.) Blankenship reported severe pain that was
relieved by nothing and tingling in his entire right leg with numbness in the bottom
of his foot. (R. at 721.) Blankenship stated that if he stood up straight, he lost strength
in his legs, but, when he was hunched over, he had full strength in his legs. (R. at
721.) On physical examination, Blankenship had an antalgic gait, but required no
assistive devices; he had paraspinal fullness in the lumbar spine on the right and
restricted range of motion secondary to pain; he was unable to lie flat and could not
tolerate any exam diagnostics secondary to severe pain; and he reported that he had
decreased sensation to his entire right lower extremity. (R. at 723.) Dr. Shurtleff
prescribed non-narcotic pain medications and referred Blankenship to physical
therapy. (R. at 724.) On August 25, 2016, Blankenship saw Dr. Shurtleff for back
pain, and he reported that he had been unable to attend physical therapy because he
was in too much pain. (R. at 730.) Blankenship reported that he had been prescribed
Norco, which relieved his pain for only about an hour. (R. at 730.) Blankenship

stated that muscle relaxers, physical therapy, a TENS unit, cold packs, exercises, stretches and strengthening techniques failed to relieve his pain. (R. at 730.) On physical examination, Blankenship's gait was antalgic; he had muscle spasming in the lumbar spine on the left; strength testing was essentially nondiagnostic secondary to pain; sensation was equal and intact in the lower extremities, bilaterally; he was unable to lie flat on the table for straight leg raise testing; and patellar reflexes were equal, but seemed decreased from the previous exam, secondary to patient guarding. (R. at 732.) Dr. Shurtleff ordered an MRI of the lumbar spine, prescribed a different muscle relaxer and put an order in for a cane, per Blankenship's request. (R. at 733.)

On September 15, 2016, Blankenship again saw Dr. Shurtleff for lower back pain. (R. at 735.) He reported that his pain was unchanged since his injury, and the previously ordered MRI showed degenerative disc disease, predominantly centered at the L4-L5 level. (R. at 735-36.) On physical examination, Blankenship had an antalgic gait and ambulated with a cane; strength testing was essentially nondiagnostic secondary to pain; sensation was intact in the lower extremities, bilaterally, but he reported decreased sensation to the lateral proximal lower extremity; he was unable to lie flat on the table for straight leg raise testing; and patellar reflexes were equal and consistent with the previous examination. (R. at 737-38.) Dr. Shurtleff referred Blankenship to pain management and neurosurgery and noted that he declined any change in his current medical therapy. (R. at 738.) Workers' compensation surveillance footage dated the same day, and described by Dr. Travis in his report, reflected Blankenship "walking very well with no limp" and no cane, and, less than two hours later, going into Dr. Shurtleff's office with a pronounced limp and utilizing a cane. (R. at 465-66.)  On October 13, 2016, Blankenship saw Dr. Shurtleff with complaints of lower back pain, stating that his right leg was tingling, and the bottom of his right foot was numb. (R. at 715.)

Blankenship stated that his pain was a four to five out of 10, and when he woke up in the mornings, he could not "move his right leg unless he reaches down and pulls on it himself," after which he was able to move his right leg again. (R. at 715.) Blankenship stated that physical therapy had not provided him any relief, and he had not made progress. (R. at 715.) On physical examination, Blankenship ambulated with a cane and had an antalgic gait; strength testing was essentially nondiagnostic secondary to pain; he was unable to lie flat on the table for straight leg raise testing; and sensation was intact in the bilateral lower extremities, though he reported decreased sensation to the entire lateral right lower extremity. (R. at 717.) Dr. Shurtleff prescribed a compounded pain cream, and he noted that Blankenship had an upcoming pain management appointment. (R. at 718.)

On November 10, 2016, Blankenship saw nurse practitioner Sanger, a pain management provider, for lower back pain. (R. at 740.) Blankenship reported pain that was a six out of 10 in severity, fluctuating, persistent, burning, numb, sharp and radiated to the right lower extremity. (R. at 740.) Blankenship reported that his pain was relieved by nothing and was aggravated by bending, rest, sitting, standing, twisting and walking. (R. at 740.) On physical examination, Blankenship's gait was antalgic, and he used a cane; he had moderate pain with motion; there was mild swelling over the lower lumbar region and moderate pain with palpation; any movement of the right leg increased his pain; he was able to fully flex and extend his right foot, but with increased lower back pain; his posture was stooped forward slightly to relieve his back pain, and standing straight up caused more severe pain. (R. at 744.) Sanger prescribed Ultram and Neurontin and stated that Blankenship may be a candidate for injection therapy after a neurosurgical evaluation. (R. at 745-46.) On November 16, 2016, Dr. Shurtleff noted that Blankenship had not yet been able to start the medications prescribed by his pain management provider because

workers' compensation had not approved them. (R. at 755.) On December 9, 2016, Blankenship saw Sanger with complaints of lower back pain with a severity of five out of 10 that radiated into the right thigh and knee. (R. at 771.) Blankenship reported that his symptoms were aggravated by standing and walking, and although his pain was relieved by lying down, it was 10 out of 10 upon waking up in the morning. (R. at 771, 776.)

On January 4, 2017, Blankenship saw Dr. Shurtleff, complaining of pain that was a five or six on a 10-point scale, which he said was his average since the onset of symptoms. (R. at 785, 788.)  Blankenship reported that Neurontin helped his sleep, but Tylenol-Codeine #3 did not help his pain, and physical examination findings were unchanged. (R. at 787.) On January 6, 2017, Blankenship saw Sanger for pain management, reporting seven out of 10 pain, and he was prescribed Norco. (R. at 789, 794.) Blankenship saw Sanger on February 3, 2017, reporting five out of 10 lower back pain that radiated to his right foot and was relieved with medication and lying on either side with his back curved in a fetal position. (R. at 797.) Blankenship required no medication adjustments. (R. at 802.) On February 15, 2017, Blankenship saw Dr. Shurtleff, reporting that his symptoms were grossly unchanged. (R. at 806, 809.) On March 8, 2017, Blankenship saw Sanger, complaining of six out of 10 lower back pain that radiated to his right foot and was relieved by pain medication and rest. (R. at 810, 817.) That same day, surveillance footage described by Dr. Travis showed Blankenship walking into Sanger's office using a cane and, later that day, walking out of a restaurant with no cane or limp and placing his child into a car seat with no apparent difficulty. (R. at 466.) Blankenship saw Dr. Densler on March 14, 2017, for a neurosurgical evaluation, reporting lower back pain that radiated down the right leg. (R. at 749.) He complained of increased pain after physical therapy and ambulated with a cane. (R. at 749.) Dr. Densler noted that

Blankenship was not a surgical candidate because he had not maximized conservative therapy. (R. at 753.) On physical examination, Blankenship had positive straight leg raise testing on the right at 10 degrees; intact sensation; normal motor functioning; normal balance, gait and coordination; and normal deep tendon reflexes. (R. at 753.)

On March 22, 2017, Blankenship saw Dr. Shurtleff, stating that his symptoms were stable and unchanged and he had no complaints. (R. at 819.) On March 27, 2017, on surveillance footage described by Dr. Travis, Blankenship was observed exiting a building while carrying large packages without a cane or a limp. (R. at 466.) On April 5, 2017, Blankenship saw Sanger, reporting five out of 10 lower back pain that radiated to his right foot, relieved by pain medication and rest. (R. at 824, 830.) Sanger scheduled an epidural steroid injection. (R. at 829.) On May 24, 2017, Blankenship saw Dr. Shurtleff, again reporting that his symptoms were stable and unchanged. (R. at 760.) On physical examination, Blankenship was uncomfortable; he walked with an antalgic gait and utilized a cane; he had moderate pain with motion, and paraspinal fullness was noted in the right lumbar spine; and he reported decreased sensation to the right lower extremity, laterally. (R. at 762.) That same day, Blankenship underwent a lumbar epidural steroid injection, which he tolerated well. (R. at 769.) A June 14, 2017, MRI of the lumbar spine without contrast showed a mild, intervertebral disc desiccation at L4-L5 and L5-S1. (R. at 837.) On July 26, 2017, Blankenship saw Dr. Shurtleff, who referred him to neurosurgery after the epidural steroid injection worsened his lower back pain for a month before returning to baseline. (R. at 838, 841.)

On September 19, 2017, Blankenship saw Dr. Densler, who noted that Blankenship ambulated with a cane, had exhausted conservative treatment and was

a surgical candidate. (R. at 843, 847.) On November 7, 2017, after reviewing Blankenship's most recent MRI, Dr. Densler planned an L4-L5 right decompression. (R. at 856.) On December 6, 2017, Blankenship saw Dr. Shurtleff, reporting that his symptoms were unchanged, and he was unable to sleep at night due to back pain. (R. at 780.) Dr. Shurtleff noted that Blankenship had been deemed at maximum medical improvement, and although Dr. Densler recommended surgery, insurance would not approve it. (R. at 780.) On May 22, 2019, Blankenship saw Dr. Shurtleff for the first time since December 6, 2017, requesting an updated MRI. (R. at 857.) On examination, Blankenship was uncomfortable; he had muscle spasm in the right lumbar paraspinal muscles that mildly radiated heat; right patellar reflex was absent; sensation was decreased in the lateral right lower extremity; and strength testing was nondiagnostic secondary to reproduced lower back pain. (R. at 782.) Blankenship reported pain that was a six out of 10, and an MRI showed mild intervertebral disc space desiccation at L4-L5 and L5-S1. (R. at 861, 864.)

On May 11, 2020, Blankenship had an initial physical therapy visit following his lumbar spine fusion and decompression. (R. at 903.) He reported that his right-sided pain had improved, but he had begun having pain in his left lower extremity. (R. at 903.) Blankenship demonstrated active range of motion in the bilateral lower extremities that was grossly within normal limits, but he had pain with knee extension and hip flexion, worse on the left. (R. at 904.) Blankenship complained of pain with all trunk movements and had limited range of motion. (R. at 904.) On July 1, 2020, Blankenship endorsed a 50 percent improvement in symptoms with physical therapy and rated his pain as a five out of 10, reporting continued numbness of the left foot and difficulty negotiating stairs and walking long distances. (R. at 968.) On July 28, 2020, Blankenship endorsed pain of four out of 10 during treatment, but he could not complete all exercises and was "in noticeable pain throughout [the]

treatment session." (R. at 946.) On July 29, 2020, Blankenship rated his pre-treatment pain as a four out of 10. (R. at 944.) He continued physical therapy through August 13, 2020, demonstrating improved lumbar active range of motion and bilateral lower extremity flexibility and strength. (R. at 943.) On November 5, 2020, Blankenship resumed physical therapy due to left and right lower extremity numbness and tingling. (R. at 923.) He demonstrated deficits in lumbar range of motion, lower extremity strength and functional activity tolerance. (R. at 923.) He identified improved gait, functional mobility and return to work activities as goals. (R. at 923.) In December 2020, Blankenship showed improved lumbar active range of motion, flexibility and bilateral lower extremity strength, but deficits remained, and his physical therapist recommended extending his therapy. (R. at 926.) On January 22, 2021, Blankenship again endorsed a 50 percent improvement in his symptoms with physical therapy, stating he had improved lumbar and bilateral lower extremity flexibility, but his pain was a six out of 10, he had weakness in his bilateral lower extremities, and he continued to experience radicular symptoms, worse on the left. (R. at 930.) By March 4, 2021, Blankenship completed 23 physical therapy sessions. (R. at 938.) He was recommended for continued physical therapy to focus on lumbar, core and lower extremity range of motion, strength and stabilization and postural therapy and he was considered to have a good rehab potential. (R. at 1062.) On April 14, 2021, Blankenship reported a 70 percent improvement in his symptoms since starting physical therapy. (R. at 1066.)

Blankenship contests that the ALJ adequately considered his physical therapy records, specifically, because the ALJ stated only that Blankenship had 50 percent symptom improvement since beginning physical therapy, and without reconciling this with Blankenship's complaints of six out of 10 pain, tightness in the lower back muscles and continued weakness in the bilateral lower extremities. (R. at 24-25.)

Blankenship also argues that the ALJ cherry-picked the January 22, 2021, visit, at which he reported 50 percent symptom improvement, as Blankenship reported continued six out of 10 pain on March 4, 2021. As described more fully above, it is evident, however, that the ALJ did not cherry-pick the January 22, 2021, treatment note, because this report of improvement was not an isolated event. In particular, on March 15 and 17, 2021, Blankenship reported four out of 10 pain before physical therapy and, on March 15, he reported two out of 10 pain after physical therapy. (R. at 1088, 1090.) Moreover, on March 23, 2021, he reported 70 percent symptom improvement since starting physical therapy, and on April 5, 2021, he reported a 75 percent improvement in his symptoms since starting physical therapy, endorsing improved pain, radicular symptoms and mobility and four out of 10 pain. (R. at 1075, 1086.) Likewise, on April 12, 2021, Blankenship reported 75 percent symptom improvement with physical therapy and five out of 10 pain, and it was noted that he had reached a plateau in his progress and would likely be discharged at the next session. (R. at 1071.) Finally, on April 14, 2021, he reported 70 percent symptom improvement with physical therapy and five out of 10 pain. (R. at 1066.)

In his decision, the ALJ refered to multiple visits that Blankenship had with various providers, including an August 16, 2016, emergency room visit at which he reported seven out of 10 pain, and physical examination was positive for "muscle spasm, back tenderness, and limited range of motion." (R. at 24, 416.) The ALJ also discussed a visit with Dr. Patel on August 23, 2016, at which Blankenship complained of "backache with numbness in the right leg and difficulty with bending and stooping," and physical examination was positive for a "limp, positive bilateral straight leg raise, and low back tenderness with muscle spasm and reduced range of motion." (R. at 24, 391-92.) The ALJ also noted that Blankenship told Dr. Patel that he had no relief from a steroid pack and physical therapy. (R. at 24.) The ALJ

proceeded to state that "[a]lthough the claimant was treated with medication, physical therapy, and injections … he continued to report significant pain." (R. at 24.) The ALJ discussed Blankenship's neurosurgery evaluation, including his assertions of 10 out of 10 pain, increasingly worse right lower extremity pain, and that he ambulated with a cane. (R. at 24.)

In determining a claimant's residual functional capacity, "[t]he ALJ must consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect [the claimant's] ability to work.'" *Thomas v. Berryhill,* 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)). The residual functional capacity assessment must also "[c]ontain a thorough narrative discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate." S.S.R. 96-8p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013), 1996 WL 374184, at *7 (July 2, 1996). "Thus, a proper [residual functional capacity] analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas*, 916 F.3d at 311. While the Commissioner's decision must "contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based," *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting 42 U.S.C. § 405 (b)(1)), there is no requirement that the ALJ specifically refer to every piece of evidence in his decision. *Reid,* 769 F.3d at 865 (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)). Blankenship was extremely consistent when reporting his symptoms, and his complaints rarely changed substantially. The ALJ was not required to analyze every page of Blankenship's medical record, especially when his

complaints were so consistent, and nothing would be gained from a duplicative discussion of the issues. Consequently, I find that the ALJ's residual functional capacity finding is supported by substantial evidence.

For the reasons stated herein, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his ultimate residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's finding that the medical opinion of Dr. Kriss was persuasive;

2.  Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.  Substantial evidence exists in the record to support the Commissioner's finding that Blankenship was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. §
636(b)(1)(C):

> Within fourteen days after being served with a copy [of this
> Report and Recommendation], any party may serve and file written
> objections to such proposed findings and recommendations as provided
> by rules of court. A judge of the court shall make a de novo
> determination of those portions of the report or specified proposed
> findings or recommendations to which objection is made. A judge of
> the court may accept, reject, or modify, in whole or in part, the findings
> or recommendations made by the magistrate judge. The judge may also
> receive further evidence or recommit the matter to the magistrate judge
> with instructions.

Failure to file timely written objections to these proposed findings and
recommendations within 14 days could waive appellate review. At the conclusion
of the 14-day period, the Clerk is directed to transmit the record in this matter to the
Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and
Recommendation to all counsel of record at this time.

DATED:     December 12, 2025.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-40-